# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| PAMELA R. LAY, BRIAN DUCOTE, RYAN JETER, ALYSSA JAYNES, MARCUS DEVANE, AND SIMON SUAREZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | Civ. No. 5:12-cv-00754-DAE |
| SPECTRUM CLUBS, INC. AND GOLD'S GYM INTERNATIONAL, INC., GOLD'S TEXAS HOLDINGS GROUP, INC., GBG, INC., GOLD'S ALABAMA, LLC, GOLD'S GYM ROCKIES, LLC, GOLD'S HOLDING CORP., GOLD'S OKLAHOMA, LLC, GOLD'S ST. LOUIS, LLC | § § § § § § § § § § § | |
| **Defendants.** | § § § | |
| LAWRENCE J. LANE, MACARIO ESCAMILLA, III, AND SIMON SUAREZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | § § § § § § | |
| **Plaintiffs,** | § § | Civ. No. 5:12-CV-00930-DAE |
| v. | § § | |
| GOLD'S GYM INTERNATIONAL, INC., GOLD'S TEXAS HOLDINGS GROUP, INC., GOLD'S HOLDING CORP. AND GGI HOLDINGS, LLC | § § § § § | |
| **Defendants.** | § § | |

## GOLD'S DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR CONDITIONAL CERTIFICATION AND ISSUANCE OF NOTICE

# TABLE OF CONTENTS

**Page**

I.    PERTINENT PROCEDURAL BACKGROUND ............................................................ 2

II.   BACKGROUND ....................................................................................................... 3

    A.    Gold's Business Operations ............................................................................... 3

    B.    Timekeeping Policies and Practices ................................................................... 3

    C.    Sales Managers' and Fitness Consultants' Sales Goals ...................................... 5

    D.    Sales Managers' and Fitness Consultants' Schedule and Work Hours ................ 7

III.  ARGUMENT ............................................................................................................ 9

    A.    Plaintiffs Have Not Met Their Burden To Show Gold's Has A Common Policy To Violate Their Lawful Policies ........................................................... 11

    B.    Plaintiffs Cannot Establish They Are Similarly Situated To Their Proposed Classes Based On Their Brief Uncommon Experiences As Former Spectrum Employees In San Antonio ..................................................... 14

    C.    Plaintiffs' Theory That Putative Class Members Felt "Pressure" To Achieve Sales Goals Is Not A Basis For Notice Because Sales Goals and Sales Abilities Vary Across the Putative Class ..................................................... 20

    D.    Notice Should Be Denied Because The Issue Of Gold's "Knowledge" Of Off-the-Clock Work Requires Individual Inquiries ............................................ 22

    E.    Plaintiffs Have No Method Of Calculating Damages On A Class-Wide Basis ............................................................................................................... 23

    F.    Some Sales Managers and Fitness Consultants Are Overtime-Exempt Under FLSA Section 207(i) .............................................................................. 24

IV.   PLAINTIFFS' PROPOSED NOTICE IS INAPPROPRIATE ....................................... 25

V.    CONCLUSION ....................................................................................................... 25

**TABLE OF AUTHORITIES**

<u>CASES</u>                                                                                                                                  **Page**

*Aguilar v. Complete Landsculpture, Inc.*,
    No. 3:04-cv-0776-D, 2004 WL 2293842 (N.D. Tex. Oct. 7, 2004) ........................................9

*Andersen v. Wells Fargo Fin., Inc.*,
    No. 4:11-cv-00085-JAJ-TJS, 2012 U.S. Dist. LEXIS 23175 (S.D. Iowa Feb. 6, 2012) .........11

*Beauperthuy v. 24 Hour Fitness*,
    772 F. Supp. 2d 1111 (N.D. Cal. 2011) ..................................................................................25

*Carey v. 24 Hour Fitness USA, Inc.*,
    No. 4:10-cv-03009, 2012 WL 4857562 (S.D. Tex. Oct. 11, 2012) ................................ passim

*Castle v. Wells Fargo Fin., Inc.*,
    No. C-06-4347-SI, 2008 WL 495705 (N.D. Cal. Feb. 20, 2008) ...........................................23

*Clay, et al. v. Huntington Ingalls Inc.*,
    No. 2:09-cv-07625-NJB-JCW, 2011 U.S. Dist. LEXIS 155351 (E.D. La. Sept. 29,
    2011) .....................................................................................................................................10

*Comcast v. Behrend*,
    133S. Ct. 1426 (2013).........................................................................................................23, 24

*Cuevas v. Citizens Financial Group, Inc.*,
    No. 12-cv-2832, 2013, 2013 WL 2321426 (2d Cir. May 29, 2013).......................................24

*De la Cruz v. El Paso County Water Imp. Dist. No. 1*,
    2005 WL 2291015 (W.D. Tex. Sept. 19, 2005)......................................................................9

*England v. New Century Fin. Corp.*,
    370 F. Supp. 2d 504 (M.D. La. 2005)...............................................................................14, 15

*Gibson v. NCRC, Inc.*,
    CIV.A. H-10-1409, 2011 WL 2837506 (S.D. Tex. July 18, 2011) .........................................2

*Harvill v. Westward Comm's, LLC*,
    433 F.3d 428 (5th Cir. 2005) ..........................................................................................22, 24

*Hernandez v. Ashley Furniture Industries, Inc.*,
    No. 10-cv-5459, 2013 WL 2245894 (E.D.Pa. May 22, 2013)...............................................24

*Hernandez v. Bob Mills Furniture Co. of Texas, Ltd.*,
    No. 2:10-cv-0243-J, 2011 WL 915788 (N.D. Tex. Mar. 15, 2011).......................................16

*Hickson v. U.S. Postal Serv.*,
    No. 5:09CV83, 2010 WL 3835887 (E.D. Tex. July 22, 2010).........................................11, 23

# TABLE OF AUTHORITIES

CASES                                                                                                      Page

*Long v. BDP Int'l, Inc.*,
   No. 4:12-cv-1446, 2013 BL 34330, at *5 (S.D. Tex. Feb. 8, 2013) ......................................22

*McCarragher v. Ryland Grp., Inc.*,
   CIV.A. 3-11-55, 2012 WL 4857575 (S.D. Tex. Oct. 11, 2012) .................................................2

*Mooney v. Aramco Services Co.*,
   54 F.3d 1207 (5th Cir. 1995) ...............................................................................................9

*Pacheco v. Boar's Head Provisions Co., Inc.*,
   671 F. Supp. 2d 957 (W.D. Mich. 2009) .............................................................................11

*Pickering v. Lorillard Tobacco Co., Inc.*,
   No. 2:10-cv-633-WKW, 2012 WL 314691 (M.D. Ala. Jan. 30, 2012)................................10

*RBS Citizens, N.A. v. Ross*,
   133 S. Ct. 1722 (2013)................................................................................................23, 24

*Richardson v. Wells Fargo Bank, N.A.*,
   No. 4:11-cv-00738, 2012 WL 334038 (S.D. Tex. Feb. 2, 2012) ................................... passim

*Salinas v. O'Reilly Automotive, Inc.*,
   No. 3:04-cv-1861-B, 2005 WL 3783598 (N.D. Tex. Nov. 17, 2005) ..............................14, 15

*Slattery v. HCA Wesley Rehab. Hosp.*,
   83 F. Supp. 2d 1224 (D. Kan. 2000) ...................................................................................22

*Songer v. Dillon Resources, Inc.*,
   569 F. Supp. 2d 703 (N.D. Tex. 2008) ......................................................................1, 9, 10

*Thompson v. Speedway SuperAmerica LLC*,
   No. 08-CV-1107-PJS-RLE, 2009 WL 130069 (D. Minn. Jan. 20, 2009) ........................11, 13

*Xuedan Wang v. Hearst Corp.*,
   No. 12 CV 793 (HB), 2013 U.S. Dist. LEXIS 65869 (S.D.N.Y. May 8, 2013).....................24

STATUTES

**FLSA § 216(b)** ........................................................................................................................1

**FLSA § 207(i)**.........................................................................................................................24

OTHER AUTHORITIES

29 C.F.R. § 785.11 ....................................................................................................................22

## INDEX OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Rebecca Sue Copeland |
| 2 | Excerpts from the Deposition of Lawrence Lane |
| 3 | Excerpts from the Deposition of Pamela Lay |
| 4 | Excerpts from the Deposition of Brian Ducote |
| 5 | Excerpts from the Deposition of Marcus Devane |
| 6 | Declaration of Elizabeth Reed-Grant |
| 7 | Declaration of Rocco Greco |
| 8 | Excerpts from the Deposition of Ryan Jeter |
| 9 | Excerpts from the Deposition of Macario Escamilla III |
| 10 | Declaration of Roman Dickerson |
| 11 | Declaration of Mark Fenske |
| 12 | Declaration of Michael Shaffer |
| 13 | Declaration of Bill Brown |
| 14 | Declaration of John Simmons |
| 15 | Declaration of Jeff Suender |
| 16 | Declaration of Whitley Goode |
| 17 | Declaration of Ron Gochee |
| 18 | Declaration of Katie McGrory |
| 19 | Declaration of Cory Norris |
| 20 | Declaration of Christine Fox |
| 21 | Declaration of Luis Collazo |
| 22 | Declaration of Ray Jagtiani |
| 23 | Declaration of Michael Lopez |
| 24 | Declaration of Kirk Robinson |
| 25 | Declaration of Eddie Tillis |
| 26 | Declaration of Jeremiah Marr |
| 27 | Declaration of Scott Reed |

Plaintiffs ask the Court to conditionally certify a nationwide class of more than 800 Fitness Consultants and 120 Sales Managers based only on allegations from their limited experiences during a short window of time in a small number of gyms recently acquired in San Antonio.  Plaintiffs seek such far-reaching relief based upon a few anecdotes—often targeted at an individual manager for a short period while conceding that Gold's other managers complied with the law—and without any facts related to Gold's gyms outside of San Antonio, let alone the entire county.  Courts throughout this Circuit routinely deny notice in the first stage of section 216(b) FLSA off-the-clock actions, especially where there are nationwide claims.  *See, e.g, Songer v. Dillon Resources, Inc.*, 569 F. Supp. 2d 703, 707 (N.D. Tex. 2008); *Richardson v. Wells Fargo Bank, N.A.*, 4:11-cv-00738, 2012 WL 334038, at *6-7 (S.D. Tex. Feb. 2, 2012).

When an employer has lawful written policies prohibiting off-the-clock work, such as Gold's policies here, it is well-settled that plaintiffs must demonstrate their employer had a common practice **not** to follow them.  *See Carey v. 24 Hour Fitness USA, Inc.*, 4:10-cv-03009, 2012 WL 4857562, at * 2-3 (S.D. Tex. Oct. 11, 2012); *Hickson v. U.S. Postal Serv.*, 5:09-CV83, 2010 WL 3835887 (E.D. Tex. July 22, 2010), *adopted*, 5:09-CV-83, 2010 WL 3835885 (E.D. Tex. Sept. 28, 2010).  The evidence here shows that Gold's maintained lawful written policies providing that all non-exempt employees must record all time they work and "[u]nder no circumstances is a non-exempt (hourly) Associate ever permitted to work 'off the clock.'" Notably, with the exception of one former employee who was not even disclosed to Gold's until Plaintiffs filed their motions, Plaintiffs have literally no evidence outside of former Spectrum gyms in San Antonio of any policy violations whatsoever despite the fact that the case has been pending for nearly one year.  To the contrary, the evidence shows that Sales Managers and Fitness Consultants—in the former Spectrum gyms in San Antonio, the other Gold's gyms in

San Antonio and throughout the nation—followed Gold's policies, were paid substantial

overtime, had individualized sales expectations and capacity to meet those expectations, and that

the small number of Sales Managers and Fitness Consultants in the former Spectrum gyms had

totally different policies, practices, guidelines, and expectations in the days following the

acquisition (the days on which Plaintiffs complain of problems).  By Plaintiffs' own admissions,

their experiences as former Spectrum employees were unique, differing not only from other

Gold's employees, but even from each other.  Plaintiffs simply have not met, and cannot meet,

their burden to show that notice is appropriate here and thus their Motions should be denied.

## I.    PERTINENT PROCEDURAL BACKGROUND

Plaintiffs bring two separate claims in each lawsuit for which they seek damages: that

Gold's violated the FLSA by failing to include commissions and bonuses in their regular rates of

pay for purposes of calculating overtime compensation, and that Gold's did not compensate them

for all overtime hours they worked.  Plaintiffs are correct that Gold's does not oppose notice on

their regular rate claim (and indeed has changed their practice), but that hardly allows them to

piggyback a nationwide notice on off-the-clock claims when they have not satisfied the burden

necessary for such notice.  The two claims are separate and distinct, requiring analyses of

differing facts, elements, and defenses, and combining them would result in extraordinary

inefficiencies in the litigation.  Courts regularly make separate determinations in FLSA cases as

to whether each claim asserted is appropriate for conditional certification.  *See McCarragher v.*

*Ryland Grp., Inc.*, CIV.A. 3-11-55, 2012 WL 4857575, at *6 (S.D. Tex. Oct. 11, 2012)

("Because there is nothing before the Court [allowing] it to conclude that onsite salespersons are

similarly situated with respect to the minimum wage claim, the Court declines to authorize

nationwide notice on that claim"); *Gibson v. NCRC, Inc.*, CIV.A. H-10-1409, 2011 WL

2837506, at *7-8 (S.D. Tex. July 18, 2011) (granting conditional certification as to overtime claim but not minimum wage claim).  Here too, the fact that Gold's agreed to notice on the regular rate claim out of efficiency does not support automatic notice on the off-the-clock claims.  Plaintiffs, as a matter of law, still must make a showing that they are similarly situated and have been subjected to a common unlawful practice on the off-the-clock claims.

## II.      BACKGROUND

### A.      Gold's Business Operations.

Collectively, Defendants own and operate 74 full-service mixed-gender health and fitness clubs nationwide.  (Copeland Dec. ¶ 6[1].)  Forty-one are owned and operated by Gold's Texas Holdings Group, Inc. ("GTH").  (*Id*. ¶ 5.)  GTH divides its operations into three regions—Austin, Dallas, and South Texas—each of which is managed by a Division Vice President ("DVP").  (*Id*.)  The remaining gyms are owned and operated by different corporate entities, each of which is managed by a DVP, a District Manager, or both:  Gold's Alabama, LLC, which operates four gyms; GBG, Inc., which operates one gym; Gold's Gym Rockies, LLC, which operates one gym; Gold's Holding Corporation, which operates 16 gyms; Gold's Oklahoma, LLC, which operates four gyms; and Gold's St. Louis, LLC, which operates seven gyms.  (*Id*.)

Each Plaintiff and opt-in in these cases is a former employee of Spectrum Clubs, Inc. in San Antonio, Texas.  GTH acquired Spectrum's 11 San Antonio area gyms in an asset purchase deal on March 1, 2012.  (*Id*. ¶ 7.)

### B.      Timekeeping Policies and Practices.

Gold's written policies required non-exempt employees, including Sales Managers and Fitness Consultants, to record, and be paid for, all time worked, and expressly prohibited off-the-

---

[1] All references to the record are attached as Exhibits and listed in the Index of Exhibits submitted herewith.

clock work.  (Copeland Dec. ¶¶ 8, 9.)  Gold's "Attendance, Timekeeping, and Work Schedules Policy" states: "You may not be asked by any Gold's Gym Manager to change the time you worked, to work time off the clock, or to volunteer for unpaid work.  If this occurs, please contact your Regional HR Manager immediately." (*Id*. at Ex. A.)  Gold's prohibition against off-the-clock work is further emphasized in a Human Resources memorandum periodically distributed to gym-level employees (*Id*. at Ex. B)—"Under no circumstances is a non-exempt (hourly) Associate ever permitted to work 'off the clock'"—and in its "Employee Conduct and Work Rules Policy" (*Id*. at Ex. C)—"falsification of, or failure to keep, accurate timekeeping or other business records" is a policy violation.  No Gold's policy allows employees to work without recording their time or being paid for it.  (*Id*. at ¶ 9.)  Gold's requires employees to receive approval before they work overtime, but its Policy is clear: Employees "must be paid for ALL hours worked whether scheduled or unscheduled," even if overtime "was not pre-approved by management."  (*Id*. at Ex. D.)

Gold's repeatedly trains and informs managers and non-exempt employees on time-keeping and overtime policies to ensure that they are enforced and followed.  (*Id*. at ¶¶ 9, 10.) Indeed, Plaintiffs admit they knew Gold's policies prohibited off-the-clock work.  (Lane Dep. 73:21-23; Lay Dep. 107:1-25; Ducote Dep. 108:10-109:5; Devane Dep. 121:2-122:7.)  And Gold's employs Human Resources personnel in the field to investigate complaints and review Punch Correction Forms for improprieties (Copeland Dec. ¶ 10.)  Gold's also works to ensure time records are not altered by barring General Managers ("GMs") from access to the timekeeping system.  (*Id*.)  Gold's disciplines associates and managers who violate the policy by performing or allowing off-the-clock work or failing to record all time worked.  (Reed-Grant Dec. ¶ 11; Copeland Dec. ¶ 10.)

C.    **Sales Managers' and Fitness Consultants' Sales Goals.**

Sales Managers and Fitness Consultants are responsible for generating revenue for Gold's by selling gym memberships and training packages.  (Greco Dec. ¶ 4.)  They are paid, in part, through commissions and bonuses.  (Ducote Dep. 66:25-68:19; Lane Dep. 59:6-21; Lay Dep.  74:20-75:6;171:20-22.)  The amount these employees make in commissions and bonuses depends on how well they perform towards sales goals/quotas that Gold's provides to them.  (Greco Dec. ¶ 4.)  Each gym has a monthly sales goal for new memberships and for personal training packages.  (Greco Dec. ¶ 5.)  These goals are developed through a collaboration between the GM and the regional District Manager or DVP, who submit a proposal to Gold's corporate finance team for approval.  (*Id.*)

The sales goals for each gym are different.  (Jeter Dep. 176:14-177:2; Lane Dep. 162:11-15; Escamilla Dep. 144:8-14.)  They vary widely and depend on a number of factors, including new competition, improvements at the club, the number of Gold's gyms in the area, customer traffic trends, and the gym's age (newer clubs are given higher sales goals).  (Greco Dec. ¶ 5, 6.)  Sales goals for a gym will vary from 100 to 350 new members per month, and also vary according to the time of year, with the goal typically higher at the beginning of the year.  (*Id.*)

The manner in which a particular gym's sales goals are divided up among the Sales Manager and Fitness Consultants who work there varies widely.  Some GMs divide the goals equally among the sales staff.  (Reed-Grant Dec. ¶ 8; Dickerson Dec. ¶ 11; Fenske Dec. ¶ 8.)  Other GMs assign goals based on their assessment of Sales Managers' and Fitness Consultants' abilities, considering factors such as the individual's tenure, sales experience, past projections, and level of commitment.  (Devane Dep. 40:20-41:19; Shaffer Dec. ¶ 11; Brown Dec. ¶ 12; Simmons Dec. ¶ 10.)  At least two GMs do not assign sales goals at all.  (Suender Dec. ¶ 13;

Goode Dec. ¶ 11.)  The level of discretion GMs have to assign sales goals is reflected in Plaintiffs' testimony.  Lawrence Lane, for example, testified that he felt "singled out" by his GM, whom he believed assigned higher goals to him based on his age.  (Lane Dep. 151:18-152:11; 185:15-187:2.)  In some cases, the GM personally takes on part of the sales goal. Among these GMs, the degree of responsibility varies, with GMs taking anywhere from 10 to 65% of the sales target, depending on the GM.  (*See, e.g.*, Gochee Dec. ¶ 7 (10% to GM); McGrory Dec. ¶ 9 (40% to GM); Norris Dec. ¶ 10 (60-65% to GM); Reed-Grant Dec. ¶ 8 (1 new membership per day).)

In all events, Sales Managers' and Fitness Consultants' job duties, the manner in which they sell, and their ability to meet sales targets vary depending on a number of factors including gym staffing levels, location, visibility, age of the gym, the individual's sales experience, GMs' individual expectations, and the motivation of each sales employee.  For instance:

- Macario Escamilla testified that as a Sales Manager he was responsible "just for sales," but that "out of [his] own grace," he helped out in other departments. (Escamilla Dep. 21:19-21; *see also* Fox Dec. ¶ 5.)

- Luis Collazo has been a Sales Manager at two different gyms and had two very different experiences.  At one gym, he managed Fitness Consultants, assisted with gym operations and customer care, and was less focused on production; in his current gym, he focuses exclusively on sales.  (Collazo Dec. ¶ 4.)

- Some Sales Managers work as Personal Trainers (Jagtiani Dec. ¶ 3); others do not (Fox Dec. ¶ 5; Collazo Dec. ¶ 4.)  Some Sales Managers are responsible for recruiting and interviewing new Fitness Consultants (Lopez Dec. ¶ 5; Fox Dec. ¶ 5); others are not (Collazo Dec. ¶ 4).

- In gyms that do not employ a Sales Manager, Fitness Consultants' job duties are different than those at gyms that do employ a Sales Manager; most notably their sales goals are higher.  (Suender Dec. ¶ 13 (55% of new membership goal in some months); McGrory Dec. ¶ 9 (60% of new membership goal); Dickerson Dec. ¶ 11 (44% of new membership goal); Robinson Dec. ¶ 15 (50% of club goal).)

- Some Fitness Consultants focus not just on sales but also on the impact of the Front Desk and Kids' Club to guest satisfaction, and also assist in these areas.  (Simmons Dec. ¶ 13.)

- Gyms with good visibility from major highways typically will see heavy walk-in traffic (Lane Dep. 35:13-23), and Sales Managers and Fitness Consultants at these gyms meet most of their sales goals from walk-in customers, and thus spend most of their time conducting tours and interacting with members.  (Lopez Dec. ¶ 7.)

- At less visible gyms, sales goals are harder to meet.  As Escamilla noted, "[t]hose were your toughest clubs to work at" (Escamilla Dep. 144:17-23)—and Sales Managers and Fitness Consultants at those gyms need to market through community outreach, including setting up lead boxes, information tents, and handouts.  (Brown Dec. ¶ 4; Norris Dec. ¶ 7, Reed-Grant Dec. ¶ 4; Shaffer Dec. ¶ 7.)

- Plaintiffs testified that their success as sales people greatly depended on individual abilities and circumstances.  As Jeter acknowledged, "[t]here are good sales people and bad sales people."  (Jeter Dep. 189:21-24.)  For example, Sergio Garcia, who worked as a Fitness Consultant for Jeter, had a larger referral base because he had been at his gym longer and thus did not have to work as hard to meet his goals.  (Jeter Dep. 189-192.)  Another Fitness Consultant, Ashley Stanley, had little experience and had to put more effort into making herself known.  (Jeter Dep. 191:6-192:9.)

- Escamilla claimed to be the "top salesperson in the company" and attributed this to the fact that he "[w]orked harder" and "longer hours" than others (Escamilla Dep. 18:2-4; 18:14).  Pamela Lay, by contrast, had only two weeks of fitness sales experience when she began work at Gold's (Lay Dep. 69:23-70:2; 71:15-72:22), and had a tougher time adapting to the Gold's sales model.  (See, e.g., Lay Dep. 79:5-7.)  Lane, who was on a Performance Improvement Plan near the end of his employment, had difficulty meeting his sales goals because sales had not been his primary job as a Spectrum Sales Manager.  (Lane Dep. 160:11-17; Ducote Dep. 117:20-118:5.)

**D.      Sales Managers' and Fitness Consultants' Schedule and Work Hours.**

Sales Managers' and Fitness Consultants' work schedule and hours vary depending on their gym.  In some gyms, including those where Plaintiffs worked, Sales Managers created their own schedules and the schedules of the Fitness Consultants who worked for them, in some situations without needing any approval from the GM.  (Lane Dep. 90:14-91:4; Jeter Dep. 61:9-18; Escamilla Dep. 57:9-11; 133:21-134:3.)  In fact, in Escamilla's gym, he was the top ranking manager on site for some time.  (Escamilla Dep. 85:7-88:20.)  In other gyms, the GM has discretion to manage and schedule shifts and breaks.  Some GMs schedule Sales Managers and Fitness Consultants to work 35 hours per week, and Sales Managers and Fitness Consultants at those locations often do not approach, much less exceed, 40 hour workweeks.  (Shaffer Dec.

¶ 13; Dickerson Dec. ¶¶ 14, 19; Collazo Dec ¶ 8; Norris Dec. ¶¶ 4, 15.)  Other GMs routinely permit overtime when production warrants the hours (Gochee Dec. ¶ 11) or the club is short staffed (Tillis Dec. ¶ 7).  Some gyms do not require prior approval from the DVP to work overtime.  (Collazo Dec. ¶ 12.)  Other GMs avoid overtime altogether because the slow gym traffic does not warrant it.  (Dickerson Dec. ¶ 14; Norris Dec. ¶¶ 4, 15.)  With respect to breaks, the practices vary widely.  Plaintiffs testified that whether and when they took a lunch break depended on the GM.  Lane, Jeter, and Lay testified that they virtually never clocked out for lunch under one GM, but regularly took breaks under another GM.  (*See* Lane Dep. 133:8-134:6; Lay Dep. 113:5-20; Jeter Dep. 162:25-164:4.)

Each Plaintiff and opt-in in these cases, except Dohogne (who worked for Gold's for less than a month), Navarro (six days), and Hurlburt (two weeks), recorded and were paid overtime, in some cases hundreds of hours:

| Plaintiff/Opt-In | Gym(s) | Start Date – End Date | Overtime Hours Recorded | Overtime Paid |
|---|---|---|---|---|
| Joshua Brockman | Travis | 3/1/12 – 3/24/12 | 3.57 | $38.82 |
| Marcus Devane | Concord Plaza | 3/1/12 – 4/6/12 | 32.33 | $351.60 |
| Devin Doty | Tezel | 3/1/12 – 9/20/12 | 34 | $369.76 |
| Brian Ducote | Tezel | 3/1/12 – 5/13/12 | 9.74 | $105.93 |
| Macario Escamilla | Prue Road | 3/1/12 – 6/28/12 | 93.48 | $1,752.75 |
| Marc Guzman | Rogers Ranch | 3/1/12 – 11/28/12 | 122.49 | $1,332.09 |
| Phillip  Hallberg | Concord Plaza; Bandera Trails | 3/1/12 – 3/4/13 | 81.28 | $883.94 |
| Kevin Hinze | Alamo Heights | 3/1/12 – 5/3/13 | 332.99 | $6,832.45 |
| Mark Alan Hyatt | Alamo Heights | 3/1/12 – 10/16/12 | 15.80 | $213.33 |
| Ryan Jeter | Hill Country Village | 3/1/12 – 8/13/12 | 204.62 | $3,818.20 |
| Lawrence Lane | Tezel | 3/1/12 – 10/23/12 | 74.23 | $1,352.85 |
| Pamela Lay | Tezel | 3/1/12 – 7/11/12 | 13.23 | $143.87 |
| Lauren Maleske | Travis | 3/1/12 – 5/31/12 | 14.76 | $160.52 |
| Kari Perry | Tezel | 3/1/12 – 6/18/12 | 11.38 | $123.76 |
| Luke Rood | Evans Road | 3/1/12 – 10/17/12 | 109.54 | $2,451.52 |
| Simon Suarez | Bandera Pointe; Medical Center | 3/1/12 – 8/13/12 | 146.14 | $2,974.69 |
| Raul Vela | Rogers Ranch | 3/1/12 – 8/17/12 | 38.31 | $416.62 |
| **Totals** | | | **1,457.87** | **$24,694.43** |

**III.    ARGUMENT**

Before a court may issue notice under Section 216(b), the plaintiff must show the

existence of "similarly situated" potential plaintiffs.  *See Mooney v. Aramco Services Co.*, 54

F.3d 1207, 1214 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539

U.S. 90, 123 (2003)).  To meet this burden, a plaintiff must provide evidence that putative class

members "were together the victims of a single decision, policy or plan."  *Richardson*, 2012 WL

334038, at *2 (citing *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 800-02 (S.D. Tex.

2010); *Aguilar v. Complete Landsculpture, Inc.*, No. 3:04-cv-0776-D, 2004 WL 2293842, at *2

(N.D. Tex. Oct. 7, 2004) (citing *Mooney*, 54 F.3d at 1214).  Where "the action arises from

circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy

or practice," the court should deny conditional certification.  *Carey v. 24 Hour Fitness USA, Inc.*,

No. 4:10-cv-03009, 2012 WL 4857562, at * 1 (S.D. Tex. Oct. 11, 2012) (internal citation

omitted).

Conclusory allegations are not sufficient to satisfy a plaintiff's burden even at the notice

stage of an FLSA collective action.  Rather, plaintiffs must make at least a modest **evidentiary**

showing of an unlawful nationwide policy or plan.  Thus, in *Songer*, 569 F. Supp. 2d at 707, for

example, the Northern District of Texas denied conditional certification, finding plaintiffs'

submission of "virtually identical" affidavits that "contain[ed] primarily conclusory allegations

unsupported by any factual assertions demonstrating the basis of the affiants' knowledge"

insufficient to show the existence of similarly situated employees who worked off-the-clock.  *See*

*also De la Cruz v. El Paso County Water Imp. Dist. No. 1*, No. EP-05-CV-206-FM, 2005 WL

2291015, at *2 (W.D. Tex. Sept. 19, 2005) (denying conditional certification where "[t]he

evidence before the Court include[d] only unsupported assertions of violations" and "Plaintiffs

produce[d] only conclusory statements that [did] not even meet a 'modest factual showing'"). Likewise, in *Richardson*, the Southern District of Texas found "[t]he fact that three or four managers allegedly required or condoned off-the-clock work is insufficient to warrant the complex, enormous, nationwide class that Plaintiffs request." *Richardson*, 2012 WL 334038, at *4.

Indeed, cases like *24 Hour Fitness*, *Richardson*, and *Songer* confirm that, while the standard for conditional certification is often described as lenient, plaintiffs' burden in off-the-clock cases—as opposed to other FLSA actions—remains substantial.  And the standard is even higher where, as here, certification-related discovery is conducted before plaintiffs request notice.  *See, e.g., Clay, et al. v. Huntington Ingalls Inc.*, No. 2:09-cv-07625-NJB-JCW, 2011 U.S. Dist. LEXIS 155351, at *16-17 (E.D. La. Sept. 29, 2011) ("The Court is not inclined to believe that the correct course of action is to blithely certify the action with a blind eye toward deficiencies that discovery has already revealed."); *Pickering v. Lorillard Tobacco Co., Inc.*, No. 2:10-cv-633-WKW, 2012 WL 314691, at *9 (M.D. Ala. Jan. 30, 2012) (finding it "appropriate . . .to apply a stricter, more searching, standard of review" where the parties had engaged in four months of discovery related to the plaintiffs' collective action allegations).  Notably, of the 46 cases Plaintiffs' cite in their Motions, only one—*Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tex. 2008)—certifies a nationwide off-the-clock claim, and that was a second-stage certification decision that relied on evidence from 355 opt-ins in 30 states.  That case also was decided before the *24 Hour Fitness* case, which is from the same district, is squarely on point with the instant case and denied plaintiffs' motion for conditional certification for many of the same reasons that apply in this case.  The rest of Plaintiffs' cherry-picked cases are irrelevant and/or off point, involving allegations of corporate-level misclassification of employees with the

same job duties or company-wide compensation schemes that are fundamentally different than the off-the-clock claims here.

Despite months of discovery, Plaintiffs cite allegations from <u>nobody</u> outside Texas and only one witness outside of the former Spectrum gyms in San Antonio.  As a result, they have failed to provide court-required <u>evidence</u> of any common and unlawful policies or practices affecting the purported nationwide classes of Sales Managers and Fitness Consultants.  Their Motions, therefore, should be denied.

     **A.**     **Plaintiffs Have Not Met Their Burden To Show Gold's Has A Common Policy To Violate Their Lawful Policies.**

Where a defendant maintains lawful written policies, the only way a plaintiff can show a common policy to violate the FLSA is to establish that the employer instituted a "common or uniform practice . . . to not follow its formal, written policy." *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 962 (W.D. Mich. 2009); *Thompson v. Speedway SuperAmerica LLC*, No. 08-CV-1107-PJS-RLE, 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009) (denying conditional certification and notice, explaining "plaintiffs have failed to establish a colorable basis that . . .a policy-to-violate-the-policy exists").  Evidence that some managers violated the policy is not enough—the violations must be tied to a single decision, policy or plan that binds the putative class.  *Hickson*, 2010 WL 3835887, at *6 (denying conditional certification); *Andersen v. Wells Fargo Fin., Inc.*, No. 4:11-cv-00085-JAJ-TJS, 2012 U.S. Dist. LEXIS 23175, at *19-20 (S.D. Iowa Feb. 6, 2012) ("In the absence of any evidence tending to show that Defendants routinely breached the FLSA's pay provisions, these deviations are case-specific and subject to variables, making them unfit for a collective action.").

Here, Gold's policies undeniably and repeatedly prohibit off-the-clock work:

- "You may not be asked by any Gold's Gym Manager to change the time you worked, to work time off the clock, or to volunteer for unpaid work." (Copeland Dec., Ex. A.)

- "Under no circumstances is a non-exempt (hourly) Associate ever permitted to work 'off the clock.'" (*Id.,* Ex. B.)

- Associates must "clock in and out daily at the beginning and ending of their scheduled shift, and must clock in and out for any periods not worked, such as lunch." (*Id.,* Ex. D.)

- "[F]alsification of, or failure to keep, accurate timekeeping or other business records" is a policy violation. (*Id.,* Ex. C.)

Plaintiffs even concede that these policies prohibit unpaid off-the-clock work. (Lay Dep. 107:1-25; Lane Dep. 73:21-23, 76:1-8; Ducote Dep. 108:10-109:5; Devane Dep. 121:2-122:7; Jeter Dep. 183:4-184:18.) Moreover, managers, Sales Managers, and Fitness Consultants across the country confirm that Gold's policy is to follow its written policies. (Jagtiani Dec. ¶¶ 9, 10; Simmons Dec. ¶¶ 9, 15-16; Collazo Dec. ¶ 14; Fox Dec. ¶¶ 9, 12; Marr Dec. ¶¶ 6, 8, 9; Tillis Dec. ¶¶ 8-10; Lopez Dec. ¶ 12.) And time records from Plaintiffs and opt-ins in these cases further confirm that employees complied with Gold's policies. (Copeland Dec. ¶ 11.)

Plaintiffs admit that they cannot "speak on behalf" of individuals outside of the Spectrum gyms at which they worked. (Ducote Dep. 111:19-20; Devane Dep. 73:8-18; Jeter Dep. 187:20-189:20; Escamilla Dep. 162:6-163:10, 165:10-14, 171:12-16.) And the only evidence of off-the clock work outside a former Spectrum location is a boilerplate declaration with conclusory allegations from a Sales Manager in Dallas, recently terminated for insubordination, who Plaintiffs never properly disclosed. (Lay Mot., Ex. 7; Lane Mot. Ex. 7.)[2]

Instead of actual evidence of policy violations, Plaintiffs rely on job descriptions and compensation plans applicable to Sales Managers and Fitness Consultants to try and infer a

---

[2] Gold's has moved to strike this declaration pursuant to Gold's Defendants' Motion to Strike the Declaration of Adrian Richardson, filed contemporaneously with this memorandum.

national policy or plan to require off-the-clock work.  (Lay Mot. at 15; Lane Mot. at 15.)

Plaintiffs in *Richardson* tried a similar approach when alleging off-the-clock work in the face of

lawful timekeeping and compensation policies, emphasizing similarity of job duties.  But the

Southern District of Texas rejected the argument, noting "[n]owhere do these documents state

that these duties are to be performed without compensation if done outside an employee's

regular, assigned shift hours."  *Richardson*, 2012 WL 334038, at *4.  Here too, even a cursory

review shows Gold's documents do not state that job duties are to be performed without

compensation or that employees will not be paid for work in excess of 40 hours a week.  If all

that was required to support class notice was a job description and plan that compensated

employees for sales, notice would be granted in every case against every company that

maintained such documents.

Moreover, to the extent Plaintiffs argue that there were isolated instances in the last few

years where Gold's did not enforce its policies against off-the-clock work (Lay Mot. at 4-5; Lane

Mot. at 4-5), occasional policy violations by individual managers at 74 gyms cannot establish "a

policy to violate a policy." *Thompson*, 2009 WL 130069, at *2.  And, more importantly,

Plaintiffs' evidence in support of this argument actually shows that Gold's enforces its policies.

Lane was specifically admonished by his GM for working off-the-clock and had to fill out a

Punch Correction Form for the one instance where his GM was aware of the work.  (Reed-Grant

Dec. ¶ 11.)  Likewise, in both instances where DVP Rocco Greco testified that managers may

have altered timesheets, Gold's Payroll Department caught the change, admonished the

managers, and rejected the timesheet adjustment.  (Copeland Dec. ¶ 10.)  Greco also sent HR

representatives to the managers in question to instruct them on payroll compliance.  (*Id*.)

Accordingly, Plaintiffs have failed to show that Gold's had a policy to violate its lawful written policy against off-the-clock work and, for this reason alone, notice must be denied.

**B.      Plaintiffs Cannot Establish They Are Similarly Situated To Their Proposed Classes Based On Their Brief Uncommon Experiences As Former Spectrum Employees In San Antonio.**

Notwithstanding Gold's lawful written policies and the absence of **any** evidence of a common policy to violate that policy, Plaintiffs' Motions must be denied because, as short-term, former Spectrum employees, their experiences were unique and in no way representative of the experiences of Sales Managers and Fitness Consultants at Gold's nationwide.  *See Richardson*, 2012 WL 334038, at *3-6.  Plaintiffs tout the declarations they attach to their Motions purporting to show that others have worked off the clock, but seventeen declarations from former Spectrum employees is not enough to show a common nationwide practice.  *See, e.g., England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005); (plaintiffs' submission of 232 declarations stating that managers instructed employees not to record overtime hours insufficient for conditional certification where "evidence supports the Court's conclusion that these alleged claims are based on local policies of various managers located at different sites"); *Salinas v. O'Reilly Automotive, Inc.*, No. 3:04-cv-1861-B, 2005 WL 3783598, at *2-6 (N.D. Tex. Nov. 17, 2005) (six declarations and evidence of DOL investigations into employer's labor practices insufficient to meet burden for conditional certification where evidence showed claims were "flavored by particularized conduct occurring at the store/manager level").

For instance, in *England*, the Middle District of Louisiana denied notice to a nationwide class in an off-the-clock case even though plaintiffs submitted 232 affidavits covering the majority of defendants' locations.  The court found that "[i]t is clear that this case involves a multitude of different managers at different geographical locations across the country."  *England*,

370 F. Supp. 2d at 511.  Thus, even "if liability is found at one location, this would not necessarily require this Court to also find liability at another location." *Id*.  Here, as in *England* and *Salinas*, even if Plaintiffs could show that they worked off the clock at former Spectrum gyms, that would not establish liability at other Gold's locations in light of the fact that Plaintiffs' and their declarants' experiences as former Spectrum employees are completely different from the class they seek to certify.

*First,* unlike Sales Managers or Fitness Consultants at non-Spectrum gyms (which amount to 63 of Gold's 74 full-service gyms), Plaintiffs' exempt status changed as a result of the acquisition, creating disruption and discord and, ultimately leading to a very short tenure with Gold's.  At Spectrum, Plaintiffs were classified as exempt from FLSA overtime provisions, were paid a salary, were not required to record their time, and, according to their testimony, were free to manage their own schedule.  (Devane Dep. 24:6-11, 21-23; 56:21-23; Ducote Dep. 20:1-5, 23:16-24:2; Escamilla Dep. 42:7-20.)  After Gold's acquired their gyms, Plaintiffs were hired as non-exempt employees, were paid an hourly rate, plus commissions and, in the case of Sales Managers, bonuses.  (Copeland Dec. ¶ 7.)  They were required to clock in and out at the beginning and end of shifts and for meal breaks.  (*Id*.)  By Plaintiffs' own account, these changes were unwelcome.  They described the transition as "not a very smooth [one]," (Ducote Dep. 40:24), and claimed "Gold's was micromanaged."  (Ducote Dep. 85:18-19.)  Several Plaintiffs were concerned that their pay would decrease as a result of these changes.  (Devane Dep. 47:5-18; Escamilla Dep. 50:8-25; Ducote Dep. 40:13-14, 54:12-16, 70:18-22.)  They testified that, to earn anywhere near what they made at Spectrum, they needed to make much more in commissions than they used to.  (*See* Jeter Dep. 52:20-53:2; *see also* Ducote Dep. 70:18-22.)  In an effort to alleviate these concerns, Gold's instituted a unique arrangement at former Spectrum

gyms whereby Sales Managers could work up to ten hours of overtime each week without GM approval. (Jeter Dep. 94:5-16; Lane Dep. 59:12-14; Suarez Dec. ¶ 5; Hinze Dec. ¶ 5; Copeland Dec. ¶ 7; Robinson Dec. ¶ 4; Reed-Grant Dec. ¶ 6.) Regardless, none of the Plaintiffs were willing to make the adjustments they were asked to make and all left Gold's soon after the acquisition.

*Second*, timekeeping practices were very different at the time of transition and remained different thereafter. Because former Spectrum gyms were not outfitted for Gold's Hand Punch 4000 Terminal, which is a biometric hand scanner that functions as a time clock (Copeland Dec. ¶ 15), Plaintiffs had to record time manually on a Punch Correction Form. (Lay Dep. 39:6-9; Lane Dep. 64:5-7, 64:22-65:3; Devane Dep. 53:17-22.) During this time, Plaintiffs' GMs differed as to how often they collected the forms, with some collecting them daily (Goode Dec. ¶ 5), and others collecting them once a week (Devane Dep. 54:17-55:4). Marcus Devane testified that the latter practice allowed him to record all his time for the entire week on the day the form was collected, thus increasing the risk of inaccurate recording. (*Id.*) Other Plaintiffs testified they "had no way of tracking time" during this period because the Punch Correction Form was not available right away. (Ducote Dep. 40:22-41:3.) Some Plaintiffs never recorded time through the Hand Punch 4000 Terminal because they quit prior to its installation at their gym. (Devane Dep. 57:9-20.) And still other Plaintiffs—including the lead Plaintiffs—testified that some GMs did not require them to clock out during lunch breaks. (Lay Dep. 113:5-20.) Indeed, an analysis of Plaintiffs' time records shows a correlation between their GM and whether they clocked in and out for lunch. (Copeland Dec. ¶ 12.) *See Hernandez v. Bob Mills Furniture Co. of Texas, Ltd.*, No. 2:10-cv-0243-J, 2011 WL 915788, at \*3 (N.D. Tex. Mar. 15,

2011) (denying conditional certification in off-the-clock case where plaintiff did not clock in and out for lunch while other hourly employees did).

*Third*, as a result of the Spectrum acquisition, Gold's organizes its San Antonio gyms into a tiered structure that is different than any other area of the country.  San Antonio's top three tiers (black, platinum, and ruby) consist of the 11 former Spectrum facilities, have more amenities, and cater to wealthier clientele. (Shaffer Dec. ¶¶ 4,5; Gochee Dec. ¶ 4; Robinson Dec. ¶ 8; Jeter Dep. 77:12-78:5.)  Top-tiered "black" gyms provide additional services like spa, indoor pool, whirlpool, sauna, basketball and racquetball courts, and charge higher dues than lower-tiered gyms.  (Jeter Dep. 77:18-78:5; Shaffer Dec. ¶ 4.)  Some Plaintiffs were frustrated by the time it took Gold's to classify their gym because it affected their ability to sell to members and potential customers.  As Ducote noted: "We didn't know until May what actual level packages Tezel would even be involved in.  So we had a hard time marketing to the people who were coming through our door…."  (Ducote Dep. 99:13-16.)  Lay echoed this complaint: "[W]e would advertise something and then it ended up not being that way . . . .it hurt our sales."  (*See* Lay Dep. 77:16-19).  The tiered system also meant that, unlike any other area in the country, Sales Managers and Fitness Consultants who worked for former Spectrum gyms were expected to sell "upgrades" from one level to a higher level and were compensated based on those "upgrades." (Jeter Dep. 79:11-81:12.)

*Fourth*, Plaintiffs' job duties at Gold's were significantly different than at Spectrum.  In fact, some Sales Managers had to learn to be sales people for the first time.  As Ducote testified about Lawrence Lane:

> Larry, for the first ten years, had never been a sales -- he'd been a sales manager.  So he would pretty much always push the business under the Spectrum model to his other people if he got it.  He typically handed out

> all the leads to other people.  His job was not in that form to be productive.
> His job was to help other people get where they were supposed to be.

(Ducote Dep. 117:23-118:5.)  Other former Spectrum associates complained that they had to learn a whole new Gold's vocabulary (Devane Dep. 63:13-23), and shift their focus to selling more personal training packages than they had at Spectrum (*Id.,* 63:13-16; Escamilla Dep. 77:4-21).  Plaintiffs also were expected to do more community outreach and lead generation, which differed from their experience at Spectrum.  (Escamilla Dep. 154:10-12.)  Some Plaintiffs were given higher sales goals at Gold's than they had at Spectrum; for instance, Lay testified that her goal increased from 14 to 30 per month.  (Lay Dep. 64:2-11, 75:15-20; *see also* Escamilla Dep. 66:1-4; Ducote Dep. 50:4-8.)

*Fifth*, former-Spectrum Sales Managers and Fitness Consultants used sales systems and processes to complete their transactions that differed from any other Sales Managers or Fitness Consultants throughout the country.  Indeed, some Plaintiffs testified that, rather than use Gold's Check Free system to enter sales transactions, they used an Excel spreadsheet (Ducote Dep. 61:1-9), or Spectrum's legacy sales system (Lane Dep. 95:8-14, 96:5-8).  Likewise, although Gold's required its sales staff to log appointments and walk-ins on the gym's Master Production Logs, some Plaintiffs tracked their walk-ins on Spectrum forms (Ducote Dep. 83:3-13) and their appointments using personal methods as they had at Spectrum (Ducote Dep. 85:10-16; 84:23-25).  Some Plaintiffs also continued to treat "close-out," which at Gold's is a designated date during the last week of the month, the way Spectrum did—specifically, they treated the beginning, middle, and end of the month as "close-out" weeks.  (Escamilla Dep. 170:24-171:11.)  By Plaintiffs' own admission, this practice had a drastic impact on the hours they worked.  (Lay Dep. 79:17-19; Escamilla Dep. 139:10-12.)

Viewed in this light, Plaintiffs' claims that they are similarly situated to about 120 Sales Managers and more than 800 Fitness Consultants nationwide cannot withstand scrutiny. Plaintiffs **admit** that they do not know the sales goals or the overtime and timekeeping practices at gyms other than those at which they worked.  (Lay Dep. 105:13-16; Lane Dep. 89:5-14; Ducote Dep. 53:10-12, 106:19-22, 161:2-10; Devane Dep. 73:12-18; Escamilla Dep. 117:6-7, 157:18-20, 162:6-163:10, 165:10-14; 223:23-224:15; Jeter Dep. 187:20-189:20.)  And Sales Managers and Fitness Consultants employed at other locations, outside the former Spectrum gyms, report totally different experiences, including that they have never worked off the clock. (Fox Dec. ¶ 9; Collazo Dec. ¶¶ 14, 15; Jagtiani Dec. ¶¶ 5, 10; Marr Dec. ¶¶ 6, 9; Simmons Dec. ¶¶ 9, 16.)  These non-Spectrum Sales Managers and Fitness Consultants testify that they are able to meet sales goals without working overtime (Jagtiani Dec. ¶ 8; Fox Dec. ¶ 7; Marr Dec. ¶¶ 6, 7), and record their overtime hours to the extent they work them (*Id*.).

Further, Plaintiffs and opt-ins are not even similarly situated to themselves.  Despite their claims to the contrary, all but three were paid overtime at Gold's, and the three who did not worked for less than a month and took paid time off.  The amount of overtime varies significantly among Plaintiffs and opt-ins, with some averaging more than seven hours per week for over a year, and others working relatively little, belying a claim of a uniform off-the-clock requirement even at former Spectrum locations.  And, of course, Plaintiffs' and opt-ins' individual ability and desire to adapt to Gold's policies, practices, and expectations, and their GMs' enforcement of policies vary from individual to individual.  Accordingly, there simply is no common policy or scheme that would make conditional certification of <u>any</u> class appropriate.

C.    Plaintiffs' Theory That Putative Class Members Felt "Pressure" To Achieve
      Sales Goals Is Not A Basis For Notice Because Sales Goals and Sales Abilities
      Vary Across the Putative Class.

Another independent reason the Court should deny Plaintiffs' Motions is that Plaintiffs'

primary argument—that Sales Managers and Fitness Consultants had to work more than 40

hours per week to meet individual sales goals and were "discouraged" from recording overtime

hours (Lay Mot. at 4-5, Ex. 6.1-6.8, 7; Lane Mot. at 5, Ex. 6.1, 6.3-6.6)—has been rejected as a

basis for conditional certification by the Southern District of Texas in the *24 Hour Fitness* case:

> Whether a Membership Counselor could meet the sales goals without
> working overtime depends on the goals set for each individual and the
> individual's ability to meet those goals.  The evidence indicates that the
> sales goals are not uniformly distributed among the Membership
> Counselors.  Instead, club-wide sales goals are imposed differently from
> club to club.  In establishing a particular club's goals, factors such as the
> amount of customer traffic, the age of the club, and the time of year are
> considered.  The Club Manager for each club then distributes the club-
> wide sales goals for the month among the Membership Counselors at that
> club.  In assigning goals to a particular Membership Counselor, the Club
> Manager considers factors such as the individual's tenure, experience, past
> projections, and level of commitment.

*24 Hour Fitness*, 2012 WL 4857562, at *2.

Here, as in *24 Hour Fitness*, the evidence shows that Sales Managers' and Fitness

Consultants' sales goals, and their ability to meet goals within a 40-hour workweek, varies from

gym to gym and employee to employee.  As in *24 Hour Fitness*, sales goals at Gold's are not

uniformly distributed among all sales employees.  They differ from gym to gym, based on

several factors, including local competition, improvements at the gym, the number of Gold's

gyms in the area, customer traffic trends, and the gym's age.  (*See* Section I.C *supra*.)  Each GM

divides the gym's sales goal among the Sales Manager and Fitness Consultants, sometimes

taking on up to 40% of the goal his or herself.  (See McGrory Dec. ¶ 9.)  While some GMs

divide goals equally among the sales staff, others consider a variety of factors in assigning goals,

such as the Sales Manager's or Fitness Consultants' tenure and experience, past projections, the time of year, and the employee's level of commitment.  (See Section I.C. *supra*.)  Some sales staff, like Lawrence Lane, feel they are "singled out" at times by their GM for unfair goals— Lane testified that his GM set his goals unrealistically high because of his age.   (Lane Dep. 185:15-186:6, 186:19-187:2.)  Individual sales goals also are dependent on turnover of sales employees at each gym, (Robinson Dec. ¶ 15; Simmons Dec. ¶ 10), and additional job duties for the sales staff, such as when Sales Managers work as Personal Trainers.  (Jagtiani Dec. ¶ 3.)

Beyond the fact that sales goals differ from employee to employee, Sales Managers' and Fitness Consultants' ability to achieve their goals without working overtime depends on each Sales Manager's and Fitness Consultant's individual skill, as well as the characteristics and location of the gyms at which they work.  Plaintiffs concede that an employee's ability to achieve sales goals is an individualized inquiry, dependent on individual skills, commitment, hustle, and personality.  (Devane Dep. 37:16-38:5, 69:20-71:2; Escamilla Dep. 115:7-116:1; 219:25-220:14.)  Plaintiffs also concede that, at gyms with less customer traffic, sales staff have to work differently, including developing marketing strategies and engaging in customer outreach outside the gym, than the staff at busier gyms where sales goals can be met through walk-in guests.  (Lane Dep. 35:8-39:15.)  One example of gym-specific characteristics that affect an employee's job duties is a gym that, pursuant to a contract with a local university, limits the number of non-university members and prohibits community outreach from the Sales Manager and Fitness Consultants.  (Robinson Dec. ¶ 10.)

In short, Plaintiffs' theory that sales goals dictated off-the-clock work provides no common basis of proof.  "Because the issue of  whether the [sales associates] were capable of

meeting their sales goals without working overtime hours involves a highly individualized

analysis, conditional certification is inappropriate." *24 Hour Fitness*, 2012 WL 4857562, at *2.

> **D.      Notice Should Be Denied Because The Issue Of Gold's "Knowledge" Of Off-the-Clock Work Requires Individual Inquiries.**

Plaintiffs' request for notice also must be denied because they must establish that Gold's

"knows or has reason to believe" they worked off-the-clock in order to be entitled to

compensation for the time.  29 C.F.R. § 785.11.  Defendants have a complete liability defense if

they did not have knowledge of purported work.  *See, e.g., Harvill v. Westward Comm's, LLC*,

433 F.3d 428, 441 (5th Cir. 2005) (affirming summary judgment for employer where plaintiff

presented no evidence that employer was aware that she engaged in unpaid overtime work);

*Slattery v. HCA Wesley Rehab. Hosp.*, 83 F. Supp. 2d 1224, 1230-31 (D. Kan. 2000) (granting

summary judgment to employer where plaintiff never told management that she was working

after hours).  Yet, as one court in the Southern District of Texas said, "[w]hether a [manager]

would be willing to violate [Defendant's] written company policy against 'off-the-clock' work

… requires an inquiry into the motivation and ethics of each [manager]." *See, e.g., 24 Hour

Fitness*, 2012 WL 4857562, at * 2-3.  *See also Long v. BDP Int'l, Inc.*, No. 4:12-cv-1446, 2013

WL 505232, at *5 (S.D. Tex. Feb. 8, 2013) ("Evidence of individual managers requiring

employees to work overtime and discouraging reporting of that overtime is insufficient to

establish a national, company-wide policy.").  Another court noted that "[i]t is clear that

resolution of each Plaintiff's claim will require individualized inquiries about his or her specific

managers' policies and practices.  *Richardson*, 2012 WL 334038, at *4.

Here, Plaintiffs claim that they sometimes worked behind GMs' backs or after the GM

left the gym to stay under-the-radar and work without their managers' knowledge.  (Jeter Dep.

156:16-157:8; 159:10-19.)  Others admitted that their GMs did not know the hours they were

working.  (*E.g.,* Devane Dep. 89:22-90:14, 119:2-21.)  Thus, to determine whether a GM had

constructive or actual knowledge of off-the-clock work, the Court would need to assess whether,

and how much, each of Gold's 70-plus GMs knew about any alleged off-the-clock work by <u>each</u>

of the hundreds of employees.  This would include whether a manager directed such work (*see,*

*Brumbelow*, 462 F.2d at 1327), and whether each Sales Manager or Fitness Consultant recorded

the time.  *See Richardson*, 2012 WL 334038, at *5; *see also Castle v. Wells Fargo Fin., Inc.*, No.

C-06-4347-SI, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) ("Plaintiffs' claims of altered

time cards would . . .require class member-specific testimony and evidence regarding the

circumstances surrounding the alterations, and defendant would be entitled to show that any

alterations were made for legitimate reasons, which could differ for each class member.").

Plaintiffs have not submitted any evidence showing "that the reason why the employees were not

compensated for [certain activities] is not because of human error or a rogue [ ] manager, but

because of a corporate decision to ignore [the company's] published policies…."  *Hickson*, 2010

WL 3835887, at *12 (internal citation omitted).  Because each Plaintiff's claim will require

individualized inquiries about their GM's practices, conditional certification is improper.

*Richardson*, 2012 WL 334038, at *5 (citing *Jost v. Commonwealth Land Title Ins. Co.*, No. 4:08-

cv-734, 2009 WL 211943, at *4 (E.D. Mo. Jan. 27, 2009) ("Where the 'inappropriate behavior

rested on the interpretation and implementation' of regional managers and 'there is no evidence

that managers, nationwide, failed to follow [written overtime] policies,' nationwide certification

is inappropriate.").

     **E.**     **Plaintiffs Have No Method Of Calculating Damages On A Class-Wide Basis.**

     The Supreme Court's recent opinion in *Comcast v. Behrend,*133 S. Ct. 1426 (2013), and

the subsequent vacating of *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013), confirms that

courts must undertake a rigorous analysis of class certification motions and, in particular, plaintiffs' ability to measure damages under a common classwide theory.  In *Comcast*, the Supreme Court found certification improper where plaintiffs fall "far short of establishing that damages are capable of measurement on a classwide basis," and "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id*.  A number of courts have denied class certification based on *Comcast* in wage-and-hour cases.[3]

Here, Plaintiffs must offer evidence of overtime hours each of them worked (*see Harvill v. Westward Commc'n, LLC*, 433 F.3d 428, 441 (5th Cir. 2005)), and thus cannot develop a common theory of damages.  Indeed, some Plaintiffs testified that they can only speculate as to hours they worked.  (Ducote Dep. 142:14-19, 153:17-20; Escamilla Dep. 115:3-6; Devane Dep. 125:7-14, 126:6-25; Jeter Dep. 109:24-110:18.)  They have no way of calculating their own damages, let along those of the proposed class.  This evidence falls "far short of establishing that damages are capable of measurement on a classwide basis."  *See Comcast*, 133 S. Ct. at 1433.

F.     **Some Sales Managers and Fitness Consultants Are Overtime-Exempt Under FLSA Section 207(i).**

Lastly, some Plaintiffs and putative class members are exempt from overtime under the commissioned retail salesperson exemption set forth in FLSA § 207(i).  Section 207(i) creates an exemption from overtime requirements for employees who work in retail or service establishments whose regular rate of pay exceeds one and one-half times the minimum wage and

---

[3] *See, e.g., Cuevas v. Citizens Financial Group, Inc.*, No. 12-cv-2832, 2013, 2013 WL 2321426, at * 2 (2d Cir. May 29, 2013) (applying *Comcast's* requirement of a rigorous analysis); *Hernandez v. Ashley Furniture Industries, Inc.*, No. 10-cv-5459, 2013 WL 2245894, at *1 (E.D.Pa. May 22, 2013) (denying certification, citing *Comcast* for the proposition that "it may be necessary for a court to probe behind the pleadings before coming to rest on the certification question"); *Xuedan Wang v. Hearst Corp.*, No. 12 CV 793 (HB), 2013 U.S. Dist. LEXIS 65869 (S.D.N.Y. May 8, 2013) (noting that the Supreme Court's order to vacate the Seventh Circuit decision in *RBS Citizens, N.A. v. Ross*, 133 S. Ct. 1722 (2013), and to remand for further consideration in light of *Comcast*, is probative of an application of *Comcast* beyond anti-trust cases).

who earn more than half their pay from commissions.  29 U.S.C. § 207(i).  Section 207(i) is "a

highly individualized defense because its application requires week-by-week and other period

calculations . . .specific to each individual Plaintiff and his or her particular circumstances."

*Beauperthuy v. 24 Hour Fitness*, 772 F. Supp. 2d 1111, 1126 (N.D. Cal. 2011) (citing *Johnson v.*

*TGF Precision Haircutters, Inc.*, 2005 U.S. Dist. LEXIS 44259, at *27 (S.D. Tex. Aug. 17,

2005).  Gold's has confirmed that some Plaintiffs, as well as putative class members, received

more than 50 percent of their pay from commissions during some pay periods.  (Copeland Dec.

¶ 13.)  For example, from April 1, 2012 through the end of her employment, Pamela Lay

received $11,273.94 in total compensation, $6,513.05 of which (or 58%) was in commissions.

This satisfies the §207(i) test and shows that whether the §207(i) defense applies to these

employees, and for what time periods, requires individualized calculations, and cannot be

accomplished by common proof.  *Beauperthuy*, 772 F. Supp. 2d at 126-27 (decertifying class of

personal trainers, in part because "the proof required to establish these individualized §7(i)

exemption defenses would become the overwhelming focus of a trial" and result in mini-trials

for each Plaintiff) (internal citation omitted).  Notice should be denied for this reason as well.

## IV.    PLAINTIFFS' PROPOSED NOTICE IS INAPPROPRIATE

There are several defects in the proposed notice, but arguing about those now is

premature.  In the event the Court grants notice, Gold's asks the Court to direct the parties to

confer regarding the content.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for notice.

*/s/  Natalia Oehninger*
Natalia Oehninger


Dated:      July 31, 2013

Respectfully submitted,


/s/  Natalia Oehninger _____
Brian M. Jorgensen
Texas State Bar No. 24012930
bmjorgensen@jonesday.com
Joanne Bush
Texas State Bar No. 24064983
jrbush@jonesday.com
Natalia Oehninger
Texas State Bar No. 24074831
noehninger@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Fax: (214) 969-5100

Michael J. Gray (admitted *pro hac vice*)
Illinois State Bar No. 6210880
mjgray@jonesday.com
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
Telephone:  (312) 269-3939
Facsimile:  (312) 782-8585

**Attorneys for Gold's Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2013, I electronically filed the foregoing **Gold's**

**Defendants' Brief in Opposition to Plaintiffs' Motions for Conditional Certification and**

**Issuance of Notice** with the Clerk of Court using the CM/ECF system, which will automatically

send e-mail notification of such filing to the following attorneys of record:

Lawrence Morales II
The Morales Law Firm, P.C.
115 E. Travis, Suite 1530
San Antonio, Texas  78205
Lawrence@themoralesfirm.com

Roy R. Barrera III
Shawn C. Golden
Golden & Barrera, LLP
424 East Nueva
San Antonio, Texas  78205
Telephone:  (210) 244-5858
Facsimile:  (210) 224-5890
rbarrera@golden-barrera.com
sgolden@golden-barrera.com

Christopher Williams
Proskauer Rose LLP
650 Poydras Street, Suite 1800
New Orleans, Louisiana 70130
cwilliams@proskauer.com

Richard G. Garza
Melodee L. Gruber
Jackson Walker L.L.P.
112 East Pecan, Suite 2400
San Antonio, TX  78205
rgarza@jw.com
mgruber@jw.com

Anthony J. Oncidi
Enzo Der Boghossian
Proskauer Rose LLP
2049 Century East, 32nd Floor
Los Angeles, CA 90067
aoncidi@proskauer.com
ederboghossian@proskauer.com

/s/  Natalia Oehninger
Natalia Oehninger

DLI-6448375v8